# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RICHARD GREEN, #269-134, | * | |
| Plaintiff | * | |
| v. | * | Civil No. PWG-15-3866 |
| LAURA WILSON,[1] | * | |
| SGT. WILLIAM THOMAS, | | |
| SGT. CHRISTOPHER WEDLOCK, | * | |
| DR. VINCENT SIRACUSANO, | | |
| | * | |
| Defendants | | |

*********
## MEMORANDUM OPINION

Plaintiff Richard Green is incarcerated at North Branch Correctional Institution ("NBCI"). Compl. 3, ECF No. 1. He alleges that Sergeants William Thomas and Christopher Wedlock, together with Mental Health Counselor Laura Wilson, retaliated against him by removing him from his role as a mentor to individuals housed in NBCI's "Special Needs Unit" ("SNU") and also by denying him treatment and single cell housing in the SNU, or alternatively to a bottom bunk bed. *Id.* Mr. Green also alleges that NBCI Psychiatrist Vincent Siracusano—the sole Defendant employed by the prison health care provider—was deliberately indifferent to his mental health needs. *Id.* Lastly, Mr. Green alleges that Sergeant Wedlock's deliberate indifference to his medical needs led to him injuring his right foot.

Sergeants Thomas and Wedlock and Ms. Wilson (collectively "Correctional Defendants") filed a Motion to Dismiss or, in the alternative, for Summary Judgment. Corr. Defs.' Mot., ECF No. 21. Mr. Green filed an Opposition to this motion, Pl.'s Opp'n, ECF No. 23; however, I deferred resolution of it, and denied it without prejudice, pending service upon

---

[1] The Clerk shall amend the docket to reflect the full spelling of all Defendants' names.

and response from Dr. Siracusano. ECF No. 26. Subsequently, Dr. Siracusano filed a Motion to Dismiss. Siracusano First Mot., ECF No. 32. Dr. Siracusano's Motion did not address Mr. Green's allegations that Dr. Siracusano violated his Eighth Amendment rights by having failed to treat his mental health disorders. I therefore ordered Dr. Siracusano to respond to Mr. Green's Eighth Amendment allegations, Aug. 23, 2017 Order, ECF No. 34. Dr. Siracusano complied with that order by filing a Motion to Dismiss, or in the alternative, for Summary Judgment. Siracusano Second Mot., ECF No. 38.

Although provided notice that he could file an additional response to Dr. Siracusano's second motion, ECF No. 39, Mr. Green has failed to do so. A hearing is unnecessary. *See* Local Rule 105.6 (D. Md. 2016). Defendants' motions construed as motions for summary judgment, will be granted.[2]

**Standard of Review and Evidentiary Record**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is

---

[2] Because the Correctional Defendants filed a motion titled "Motion to Dismiss or, in the Alternative, Motion for Summary Judgment," along with documents in support, to which Plaintiff responded, Plaintiff was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. *See Laughlin v. Metro. Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir. 1998); *Walker v. Univ. of Md. Med. Sys. Corp.,* No. CCB–12–3151, 2013 WL 2370442, at *3 (D. Md. May 30, 2013); *Ridgell v. Astrue,* No. DKC–10–3280, 2012 WL 707008, at *7 (D. Md. Mar. 2, 2012). Similarly, Dr. Siracusano filed a motion to dismiss or, in the alternative for summary judgment, and therefore, Plaintiff was on notice that the Court could treat the motion as one for summary judgment and rule on that basis. The title of Dr. Siracusano's motion, "Motion to Dismiss or, in the Alternative, for Summary Judgment," makes it obvious that the Court might construe it as seeking summary judgment, and thereby provides sufficient notice to Plaintiff. *See Ridgell,* 2012 WL 707008, at *7; *see Laughlin,* 149 F.2d at 260–61.

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance). "In ruling on a motion for summary judgment, this Court reviews the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Downing v. Balt. City Bd. of Sch. Comm'rs*, No. RDB 12-1047, 2015 WL 1186430, at *1 (D. Md. Mar. 13, 2015) (citing *Scott v. Harris*, 550 U.S. 372, 378 (2007)).

There is no genuine dispute of material fact if the nonmoving party fails to make a sufficient showing on an essential element of his case as to which he would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Therefore, on those issues for which the nonmoving party has the burden of proof, it is his responsibility to confront the

summary judgment motion with an affidavit that "set[s] out facts that would be admissible in evidence" or other similar facts that could be "presented in a form that would be admissible in evidence" showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c)(2), (4); *see also Ridgell,* 2012 WL 707008, at *7; *Laughlin,* 149 F.2d at 260–61.

Defendants collectively attached to their motions multiple affidavits, verified Medical Records, and the administrative filings regarding Mr. Green's voluminous grievances with NBCI. Admin. R., 21-2; Med. R., ECF No. 21-3; Wilson Decl., ECF No. 21-4; Thomas Decl., ECF No. 21-5; Wedlock Decl., ECF No. 21-6; Siracusano Decl., ECF No. 38-5. In contrast, Mr. Green filed an opposition only to the Correctional Defendants' motion, and has submitted minimal evidence as he relies on his allegations, which are contained in an unverified complaint, one sick call request, a "Wellness Therapy Group Contract" and its associated rules, and a response from his request for a bottom bunk. Def.'s Exs., ECF No. 23-1.[3] Because Plaintiff's Complaint is not verified, its factual assertions may not be considered in opposition to Defendants' motion. *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); Fed. R. Civ. P. 56(c)(1)(A); *see also Abdelnaby v. Durham D & M, LLC*, No. GLR-14-3905, 2017 WL 3725500, at *4 (D. Md. Aug. 29, 2017) (awarding summary judgment for the defendants, because the plaintiff could not "create a genuine dispute of material fact 'through mere speculation,'" and "[t]hus, the Court [wa]s left with a record that [wa]s bereft of evidence supporting any of Abdelnaby's arguments") (quoting *Beale v. Hardy*, 769, F.2d 213, 214 (4th Cir. 1985)).

**Background**

Mr. Green initiated this litigation premised on his allegations that on May 13, 2015, "[i]n retaliation to [his] verbal and written complaints about the abusive treatment of NBCI's mentally

---

[3] Mr. Green's exhibits have been docketed as one document in the Court's electronic filing system. *See* ECF No. 23-1.

ill inmates, [he] was falsely accused of rule violations and removed from [his] (mentoring) of the Special Needs Unit inmates work detail . . . ." Compl. 3. He further alleges that he was denied adequate care and treatment for his "mental disorder" by Ms. Wilson and Sergeant Thomas and that their "actions lead [sic] to serious injury to my right foot due to the change in my housing assignment and deliberate indifference to my serious mental health care treatment by" Dr. Siracusano and Sergeant Wedlock. *Id.*

Prior to January 21, 2015, Mr. Green was employed in a skilled position with the dietary department. Admin R. 7. After demonstrating "poor work habits," Mr. Green was interviewed for reassignment to a sanitation position. At that time, Correctional Officer C. Pratt attempted to escort Mr. Green to a new cell; however Mr. Green refused to be moved from a single cell to a double cell. *Id.* at 10, 39. Officer Pratt, a non-party, then filed a Notice of Inmate Rule Violation based on Mr. Green's refusal, *id.* at 10, and Mr. Green was found guilty of not complying with Officer Pratt's order, *id.* at 15. Mr. Green was initially sentenced to 45 days of cell restriction, which was later reduced to 30 days by Acting Warden Richard Miller. *Id.* at 20.

Mr. Green unsuccessfully appealed, *id.* at 19, and on February 17, 2015, filed a an Administrative Remedy Procedure form ("ARP"), ARP NBCI-0354-15, alleging that Officer Pratt filed the Notice of Inmate Rule Violation against him in retaliation for Mr. Green having filed an ARP against Officer Pratt previously. *Id.* at 35, 39–40. These claims were investigated and dismissed because NBCI had substantive, non-retaliatory reasons for why Mr. Green was reassigned from a single cell to a double cell, mainly that single cell assignments were reserved for those with health issues or a job requiring housing in that unit. *Id.* at 35–41. In addition, Officer Pratt wrote a statement denying that he acted in retaliation against Mr. Green. *Id.* at 40.

5

Mr. Green's appeal to the Commissioner also was dismissed after being investigated. *Id*. at 42–45.

Two months after Mr. Green filed the ARP, on April 6, 2015, Mr. Green was moved to a single cell in Housing Unit #2 to work as a mentor for the Special Needs Unit ("SNU"). That day, Mr. Green signed a Wellness Therapy Group Contract, Mentor Contract, ECF No. 23-1, at 1, and received the Rules and Regulations for the Wellness Therapy Group, Rules and Regulations, *id.* at 2. Mr. Green participated as a mentor in group therapy on April 13, April 23, May 4, and May 11, 2015, under Ms. Wilson's direction (then known as Laura M. Booth). Med. R. 73, 78–80.

On May 4, 2015, while still working as a mentor, Mr. Green filed ARP NBCI-0862-15, which alleged that Acting Warden Richard Roderick discriminated against SNU inmates by not allowing them to attend an event featuring Darryl Strawberry. Admin R. 50–51. Mr. Green's allegations were investigated and his grievance was dismissed because NBCI restricted access based on security and capacity concerns. *Id.* at 50, 52–57. Mr. Green's appeals were then denied as NBCI's restrictions were deemed legitimate concerns. *Id*. at 58–60.

On May 13, 2015, Mr. Green was removed from his role in mentoring SNU inmates. Compl. 3; Admin. R. 81. According to Ms. Wilson, Mr. Green was removed from the position after five weeks due to his inability to establish a positive relationship with staff and overstepping boundaries [and that h]e persistently exhibited an adversarial relationship with staff, which [was] not conducive to the therapeutic environment of the SNU." Wilson Decl. ¶ 6, ECF No. 21-4.

On May 27, 2015, Mr. Green filed ARP NBCI-1029-15, alleging that Acting Chief Psychologist Bruce Liller was deliberately indifferent to the safety and health of SNU inmates.

Admin. R. at 61–63. Mr. Green also raised the issue of losing his mentor position, stating that he had mental health issues, found his removal from his position a "direct threat to [his] livelihood," and was based on the fact that Sergeant Thomas and other officers "fabricate[d] and lie[d] about receiving numerous complaints . . . [that Mr. Green] could not be trusted to keep my mouth shut about the abusive actions of custody staff . . . ." *Id*. at 61. Mr. Green's ARP was dismissed because the SNU Treatment Team concluded that Green "would best be employed elsewhere and that working with the mentally ill did not appear to be a compatible job assignment . . . ." *Id*. at 61.

Mr. Green alleges that as a result of his removal from his mentorship role with the SNU, his housing status was changed, that Sergeant Wedlock of Housing Unit #3[4] assigned him a top bunk in a double cell, which led to his injuring his right foot. Compl. 3. Green asked Wedlock to move him to a bottom bunk due to the psychiatric medications he was receiving. Admin. R. 76. Mr. Green then injured his foot while attempting to descend from the top bunk; he used the toilet to assist him and fell into it.[5] Med. R. 104. Mr. Green received treatment for this injury and for a pre-existing bunion on the same foot on multiple occasions. *Id.* at 97–98, 103–05, 108–09, 125–29, and 135–39.

Mr. Green has suffered from (and may still) anxiety and mood conditions. Admin. R. 2. However, the psychiatric staff did not diagnose him with a serious mental health disorder. *Id.* at 2, 107; Wilson Decl. ¶ 5. Nonetheless, basic mental health evaluations and consultations have

---

[4] Sergeant Wedlock attests that he has no role in providing medical care to prisoners. Wedlock Decl. ¶¶ 4–7.

[5] It is unclear why Mr. Green names Sergeant Thomas in his Complaint. Sergeant Thomas does not appear to have been involved in Mr. Green's bed assignment, which under any interpretation does not state an Eighth Amendment claim. Further, it does not appear he was related to the treatment of Mr. Green's foot after his fall and Sergeant Thomas has stated that he plays no role in providing medical care to prisoners. Thomas Decl. ¶¶ 4–6.

been provided to him. For example, on July 15, 2015 and August 14, 2015, Mr. Green consulted with Lauren Beitzel, LCPC, concerning his progress in the mentoring program. He was seen for anxiety and mood issues on April 21, 2015 by Deirdre Mull, CRNP, on June 30, 2015 by Lauren Beitzel, LCPC, on July 29, 2015 by Dr. Siracusano, on September 17, 2015 by Dr. Siracusano and Bruce Liller, on October 28, 2015 by Bruce Liller, and on January 14, 2016 by Dr. Siracusano and Bruce Liller. Med. R., 75–77, 85, 94, 107, 111–14, 124, 142–45.

**Analysis**

*Medical Eighth Amendment Claims Against Dr. Siracusano and Sergeant Wedlock*

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th Cir. 2003) (citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976).

> Deliberate indifference is a very high standard—a showing of mere negligence will not meet it . . . [T]he Constitution is designed to deal with deprivations of rights, not errors in judgments, even though such errors may have unfortunate consequences . . . To lower this threshold would thrust federal courts into the daily practices of local police departments.

*Grayson v. Peed*, 195 F.3d 692, 695–96 (4th Cir. 1999).

Deliberate indifference to a serious medical need requires proof that, objectively viewed, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To meet the

objective requirement, the medical condition at issue must be serious. *See Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). A medical condition is serious when it is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008), *see also Scinto v. Stansberry*, 841 F.3d 219, 228 (4th Cir. 2016) (failure to provide diabetic inmate with insulin where physician acknowledged it was required is evidence of objectively serious medical need). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Va. Beach Corr. Ctr.*, 58 F.3d 101, 105 (4th Cir. 1995) (quoting *Farmer*, 511 U.S. at 844). If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *See Farmer*, 511 U.S. at 844.

The reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000) (citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998)) (holding that the focus should be on the precautions actually taken in light of the known risk, not those that could have been taken), *see*

*also Jackson v. Lightsley*, 775 F.3d 170, 179 (4th Cir. 2014) (prescribing treatment raises fair inference that physician believed treatment was necessary and that failure to provide it would pose an excessive risk). While "a prisoner does not enjoy a constitutional right to the treatment of his or her choice, the treatment a prison facility does provide must nevertheless be adequate to address the prisoner's serious medical need." *De'lonta v. Johnson*, 708 F.3d 520, 525–26 (4th Cir. 2013) (holding that an inmate pleaded a claim for deliberate indifference when the prison would not evaluate her for surgery that was an approved treatment for her serious medical need despite her repeated complaints regarding the ineffectiveness of her current treatment). The right to treatment is "limited to that which may be provided upon a reasonable cost and time basis and the essential test is one of medical *necessity* and not simply that which may be considered merely desirable." *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir. 1977).

The Eighth Amendment does not recognized any distinction between the right to medical care for physical ills and its psychological and psychiatric counterparts. *Bowring v. Goodwin*, 551 F.2d 44, 47 (4th Cir. 1977). A prisoner is entitled to mental health treatment if a

> [p]hysician or other health care provider, exercising ordinary skill and care at the time of the observation, concludes with reasonable certainty (1) that the prisoner's symptoms evidence a serious disease or injury; (2) that such disease or injury is curable or may be substantially alleviated; and (3) that the potential for harm to the prisoner by reason of delay or the denial of care would be substantial.

*Id*. at 47–48. The right to such treatment is based upon the essential test of medical necessity, not because such care is merely desirable. *Id*. at 48.

The record before me indicates that Mr. Green was seen and treated for his mental illness. *See, e.g.*, Med. R. 94 (demonstrating he was prescribed Prozac,[6] Trilafon,[7] and Excedrin

---

[6] "Prozac (fluoxetine) is a selective serotonin reuptake inhibitors (SSRI) antidepressant." Prozac, Drugs.com, https://www.drugs.com/prozac.html (last visited July 26, 2018).

Migraine). However, the record also indicates that he did not suffer from a severe mental illness that would justify his placement in the SNU or require that he be granted his requests for a bottom bunk or single cell. The SNU is a small, segregated population of individuals who suffer from "serious mental illness and impairment in functioning. Inmates who can adequately function in a general population setting are better suited in less restrictive environment." Wilson Decl. ¶ 5. To the contrary, the record indicates that Mr. Green is attempting to deceive the medical technicians at NBCI in order to gain the benefit of a single cell or housing in a segregated population such as the SNU. *See* Med. R. 86, 107 (recording the following observations in two separate medical records, that on July 13, 2015, "[w]hile writing this [onsite consult] note . . . [Lauren A Beitzel, LCPC] noticed Inmate Green walk by [her] office engaging in conversation with another inmate . . . Green was smiling and laughing . . . Green's verbal presentation is not congruent with his clinical presentation."; and that on August 14, 2015, that "his request (ARP) for a single cell due to his MH diagnosis and medications. Greens recent complaints, including the single cell (on top of recent attempts to secure a bottom bunk) are an admitted attempt to get back to the SNU. He feels he needs more intensive treatment and refuses to accept anything except going to the SNU. He openly admitted to going to the SNU as a mentor in order to secure treatment for himself. He is exaggerating his mental health symptoms, but states that he plans to continue writing ARPs, letters to the commissioner, governor, Patuxent, whatever he has to do . . . He is deadset on going to the SNU as a client NOT a mentor."). Mr. Green only was housed in the SNU because he agreed to participate as a mentor. Wilson Decl. ¶ 6.

---

[7] "Trilafon is an anti-psychotic medicine in a group of drugs called phenothiazines . . . Trilafon is used to treat psychotic disorders such as schizophrenia." *Trilafon*, Drugs.com, https://www.drugs.com/mtm/trilafon.html (last visited July 26, 2018).

Likewise, Mr. Green was not deprived of a bottom bunk in contravention of medical orders, and Mr. Green received adequate treatment by medical personnel for his foot injury. *See* Med. R. 53, 97, 135 (prescribing indomethacin[8] twice per day as needed for his foot pain; noting that Mr. Green had "mild swelling" on his right foot from falling; noting that the pain stems from a bunion on his right foot and that he was provided patches for comfort). Further, it appears Mr. Green injured his right foot not based on anything the medical or correctional personnel did, but because he used a toilet as a stepstool to descend from the top bunk and accidentally fell into it. Med. R. 104 ("Pt reports using toilet to get off top bunk and foot slipped into toilet.").

The Eighth Amendment does not guarantee that prisoners will receive the health care of their choice or the medications they prefer, but only that serious medical conditions will not be treated with deliberate indifference. Plaintiff merely demonstrates he has a disagreement with the assessment of the medical personnel overseeing his treatment. *Williams v. Corizon Med. Serv.*, DKC-12-2121, 2013 WL 4541684, at * 7 (D. Md. Aug. 26, 2013) ("Disagreement with a medical provider does not amount to a violation of constitutional magnitude. An inmate's difference of opinion over matters of expert medical judgment or a course of medical treatment does not rise to the level of a constitutional violation."); *Williams v. Bishop*, RWT-12-1616, 2014 WL 4662427, at *6 ("A prisoner's strong desire to be in a single cell, based on his belief that his medical conditions cause difficulties with cellmates, does not entitle him to housing in a single cell unless medical providers have made a directive for a single cell based on a medical need. In this case, there has been no such directive, and thus the Plaintiff's claim amounts to a mere

---

[8] "Indomethacin is a nonsteroidal anti-inflammatory drug (NSAID) . . . Indomethacin is used to treat moderate to severe osteoarthritis, rheumatoid arthritis, gouty arthritis, or ankylosing spondylitis. Indomethacin is also used to treat shoulder pain caused by bursitis or tendinitis." *Indomethacin*, Drugs.com, https://www.drugs.com/mtm/indomethacin.html (last visited May 30, 2018).

difference of opinion over the preferred course of medical treatment.") (citing *DeFranco v. Wolfe,* 2008 WL 596735, at *12 (W.D. Pa. Mar. 4, 2008)). NBCI has demonstrated that it determined that Mr. Green was ill-suited as a mentor in the SNU program and that he was seeking participation merely to gain access to a single cell. Having concluded that he was not a proper candidate as a mentor for the SNU, Med. R. 107 ("He openly admitted to going to the SNU as a mentor in order to secure treatment for himself. He is exaggerating his mental health symptoms, . . . He is deadset on going to the SNU as a client NOT a mentor."); Wilson Decl. ¶¶ 5–6 (reporting that Mr. Green was fired from his job as a mentor because he was overstepping boundaries and was adversarial with SNU staff), SNU staff recommended his removal. Wilson Decl. ¶¶ 5–6; Admin. R. 64 ("Sgt Thomas testifies that inmate Green was recommended for release from his job as a result of poor work performance."). Moreover, Mr. Green is not entitled to a single cell in the SNU merely because he thinks he would benefit from being housed there instead of in the general population. *See Williams*, 2014 WL 4662427, at *6.

Objectively viewed, Green's foot injury, could be a serious medical condition. However, Mr. Green has not demonstrated that medical personnel were subjectively indifferent to him. Mr. Green's Complaint does not describe any specific actions or inactions taken by Sergeant Wedlock (who he is alleges is responsible), but rather, in conclusory fashion, states that the actions of Ms. Wilson and Sergeant Thomas in removing him from the SNU led "to serious injury to [his] right foot . . . and deliberate indifference . . . by Sgt. C. Wedlock of Housing Unit #3." To the contrary, the record demonstrates that other non-party medical personnel, such as Lauren Beizel and Janette Clark, ensured Mr. Green was provided medical care for his foot, which included medication and patches for comfort. *See, e.g.*, Med. R. 108 ("Reviewed right foot xray with pt: stable. Pt reports preious [sic] medications were helpful but

needs a refill. Exam of foot today with decreased swelling noted proximal joint great toe bunion, continues with mild erythema. Will give pt a silicon pad to cover bony projection to add cushion to area."). Specifically, Mr. Green has failed to identify how Sergeant Wedlock was responsible for providing medical care that was insufficient as Sergeant Wedlock has no authority and does not purport to be medical personnel. Wedlock Decl. ¶¶ 4–8. Therefore, Mr. Green has not demonstrated that Sergeant Wedlock was subjectively indifferent to his medical needs. *See Gregory v. Prison Health Servs., Inc.*, 247 F. App'x 433, 435 (4th Cir. 2007) (holding that medical personnel did not have the "the necessary state of mind to support a viable § 1983 claim" when they saw him the day he injured his wrist, referred him to an orthopedic specialist in a timely fashion, provided surgery "after less-intrusive means of treatment failed, and was seen approximately twenty-four times for treatment of his injury").

Because of the absence of admissible evidence that sufficiently contradicts Defendants' evidence or otherwise creates a genuine dispute of material fact, I find that Defendant Dr. Siracusano and Sergeant Wedlock were not deliberately indifferent towards Mr. Green's medical needs. *See Grayson*, 195 F.3d at 695; *Williams*, 2013 WL 4541684, at *7 (citing *Nelson*, 603 F.3d at 449 (8th Cir. 2010)).

*Claims Against the Correctional Defendants for Removal from the SNU*

Mr. Green also alleges that the Correctional Defendants violated his due process rights when he was removed from his SNU mentoring position without a hearing as retaliation for filing an ARP. This allegation alone is not a cognizable constitutional claim as Mr. Green has no constitutionally protected right to a prison job or to remain in a particular job once assigned. *See Awalt v. Whalen*, 809 F. Supp. 414, 416–17 (E.D. Va. 1992); *Altizer v. Paderick*, 569 F. 2d 812, 813–15 (4th Cir. 1978) ("the classifications and work assignments of prisoners in such

institutions are matters of prison administration, within the discretion of the prison administrators, and do not require fact-finding hearings as a prerequisite for the exercise of such discretion"); *McKune v. Lile,* 536 U.S. 24, 26 (2002) (stating that the "decision where to house inmates is at the core of prison administrators' expertise"). Nor does Mr. Green's "contract" regarding the rules and his responsibilities as a mentor, Mentor Contract, ECF No. 23-1, at 1–2, establish a protected liberty interest that would salvage his claim. A protected liberty interest arises where there is an imposition of an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). "[G]iven a valid conviction, the criminal defendant has been constitutionally deprived of his liberty to the extent that the State may confine him and subject him to the rules of its prison system so long as the conditions of confinement do not otherwise violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). The inability to obtain a "preferred" prison job, to which Mr. Green had no constitutional right, is not a sufficient hardship. The document Mr. Green signed served only to clarify the expectations of Mr. Green in serving as a mentor; it did not obligate prison officials to provide him with notice and an opportunity to be heard prior to his removal. *See Altizer*, 569 F. 2d at 813–15.

Even if his position as a mentor, which permitted him to enjoy special housing accommodation, were to be considered a "constitutional right," in order to prevail on a claim of retaliation, Mr. Green "must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right." *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). To make out a prima facie case of retaliation, Mr. Green must demonstrate that retaliation was the "substantial" or "motivating" factor behind Defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287

(1977) (citing *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 270–271, n. 21 (1977)). After a prima facie showing is made, the burden shifts to Defendants to demonstrate that they would have reached the same decision even in the absence of the constitutionally protected conduct. *Id*.

Mr. Green cannot meet this burden. In his complaint, he alleges that as retaliation for his verbal and written complaints, he was falsely accused of rule violations and removed from his mentoring role with the SNU. Compl. 3. Mr. Green has not provided any evidence of these complaints nor the rules he was accused to have violated. *See* Compl. 3; Pl.'s Opp'n 1–4. The record demonstrates that up to the point he was removed from the SNU mentorship program he had only been accused of two rule violations: on February 16, 2012 and January 21, 2015. Admin. R. 21, 30. The fact that these two rule violation charges occurred before he was assigned as a mentor to the SNU on April 6, 2015 demonstrate that they could not be retaliation on May 13, 2015 as Mr. Green alleges. *See* Compl. 3; Mentor Contract, ECF No. 23-1, at 1. Moreover, the only ARP Mr. Green filed before May 13, 2015 and temporally close to that date was NBCI-0862-15, which was filed on May 4, 2015. In that ARP, Mr. Green accused NBCI of engaging in discrimination by not permitting SNU inmates to attend a speaking engagement featuring Darryl Strawberry. Admin. R. 50–51. This one ARP, which is the only ARP in temporal proximity to his removal as a mentor, is insufficient to support a conclusion that it was a substantial or motivating factor in his removal—nor has Mr. Green articulated that it was—especially when taken in light of the evidence Defendants have put forth. Mr. Green participated as a mentor in group therapy on April 13, April 23, May 4, and May 11, 2015, under Ms. Wilson's direction. Med. R. 73, 78–80. Mr. Green then participated in individual therapy with Ms. Wilson on May 12, 2015, to discuss his mentoring experience and progress. *Id*. at 81.

Ultimately, Mr. Green was found unsuited for the position, "due to his inability to establish a positive relationship with staff and overstepping boundaries [and that h]e persistently exhibited an adversarial relationship with staff, which [was] not conducive to the therapeutic environment of the SNU."[9] Wilson Decl. ¶ 6; *see also* Med. R. 85 ("Green was a mentor in the SNU. He was removed and sent to HU3. Green continued to present with an inability to accept any responsibility for that decision and struggles with staff/inmate boundaries as well as understanding his function/role as a mentor."); Admin. R. 61 ("An investigation revealed that you were given an opportunity in a new program as a 'mentor' on the Special Needs Unit. After review by the SNU Treatment Team concerns were raised. It was concluded that you would best be employed elsewhere and that working with the mentally ill did not appear to be a compatible job assignment for you."). As such, Mr. Green has not demonstrated that he had a constitutionally protected right or that any of these actions were retaliatory, and therefore, summary judgment in favor of the Correctional Defendants is appropriate. *See Adams v. Rice*, 40 F.3d at 75; *Mt. Healthy City Sch. Dist. Bd. of Educ.*, 429 U.S. at 287.

**Conclusion**

Mr. Green has failed to establish that the Correctional Defendants retaliated against him for complaining about the treatment of prisoners housed in the SNU or that due process protections, including a hearing, were required prior to his removal from his mentoring position. Additionally, Mr. Green has not established that any of the defendants deprived him of treatment for his mental health needs or that he was placed at risk because he was not assigned to a bottom

---

[9] Although Defendants provide few specifics, of note is an entry from his individual therapy sessions when Ms. Wilson noted that "We processed his learning curve, boundary issues . . . He is deeply passionate about helping the mentally ill inmates, but also feels adversarial to officers, which is causing interpersonal issues. He is reluctant to see the connection between establishing some level of trust with officers and how that benefits inmates." Med. R. 81.

17

bunk. As such Defendants Sergeants William Thomas and Christopher Wedlock, Mental Health Counselor Laura Wilson, and Dr. Vincent Siracusano are entitled to summary judgment. A separate order follows.

Date: <u>July 31, 2018</u>                       <u>          /S/            </u>
                                                        Paul W. Grimm
                                                        United States District Judge